UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

WILMA ANDERSON,                          )
                                         )
            Plaintiff,                   )
                                         )
      vs.                                )        No. 4:08-CV-1441 (CEJ)
                                         )
MICHAEL J. ASTRUE, Commissioner          )
of Social Security,                      )
                                         )
            Defendant.                   )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social

Security Administration.

## I. Procedural History

On December 28, 2005, plaintiff Wilma Anderson filed applications for disability

benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for

supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et

seq.*, with an alleged onset date of February 18, 2005. (Tr. 47-49, 194-206). After

plaintiff's applications were denied on initial consideration (Tr. 34-38, 190-93), she

requested a hearing from an Administrative Law Judge (ALJ). (Tr. 8, 188).

The hearing was held on January 10, 2007. Plaintiff was represented by

counsel. (Tr. 307-22). The ALJ issued a decision on January 25, 2007, denying

plaintiff's claims. (Tr. 10-18). The Appeals Council denied plaintiff's request for review

on July 25, 2008. (Tr. 3-6). Accordingly, the ALJ's decision stands as the

Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

The ALJ received testimony from the plaintiff, who was 29 years old at the time of the hearing. (Tr. 309). She had completed 16 years of education.[1] She testified that she had taken several credits of college course work in criminal justice and environmental studies before discontinuing her studies. (Tr. 309-10). She resided with her husband and eight-year-old daughter in a mobile home located on 27 acres near her husband's parents' home. (Tr. 311-12, 299).

Plaintiff testified that she is diagnosed with bipolar disorder and depression. (Tr. 310). She experiences manic phases about once each month. These phases can be relatively short, lasting two or three days; sometimes, however, a manic phase could last for two or three weeks. (Tr. 314). During a manic phase, she testified, her mind races and she cannot complete a task because she starts thinking about the next task, and she finds it hard to sit still. Id. She makes poor decisions about things like spending money during manic phases and drives recklessly. (Tr. 313-14). In May of 2006, she was hospitalized during a manic episode after she threatened to hurt her husband. (Tr. 315). When asked whether she had ever been violent during a manic event, plaintiff described stabbing a plastic coffee cup with a knife. Id.

Plaintiff testified that she also experiences depressive episodes about once a month. (Tr. 315). At those times, it is hard for her to get up and get moving, to brush her teeth or her hair, or to make sure her daughter gets on the school bus. (Tr. 314). She described herself as withdrawn from people and stated that she does not want anybody around her. (Tr. 314-15). When she is depressed, she has a hard time seeing that her family cares about her. (Tr. 311).

---

[1]The ALJ found that plaintiff had completed 14 years of education. (Tr. 18).

Plaintiff withdrew from college in June 2005 because she could not understand the class material. Talking with the teacher and practicing did not help her to understand and she felt very frustrated. She did poorly on a test and decided that it was too stressful to remain in school. (Tr. 315-16).

Plaintiff testified that she attends church and medical appointments and goes to the store. (Tr. 311). She received psychiatric treatment from Donna Bond, a psychiatric nurse employed by Pathways, in Rolla, Missouri. (Tr. 312). Plaintiff stated that she saw Ms. Bond once every month or every two months. Ms. Bond helped plaintiff to set and keep six-month goals; she sometimes accompanied plaintiff to the grocery store or doctor. Id. Plaintiff testified that she becomes nervous at the grocery store when it is crowded, so she tries to go early in the morning. She sleeps well and is able to watch television. (Tr. 313).

John McGowan, a Vocational Expert (VE), provided testimony in response to several hypothetical scenarios: In the first, he was asked about the employment opportunities for a 27-year-old person, with 16 years of education, who has the ability to understand and remember simple and detailed instructions; the ability to respond appropriately to supervisors and coworkers; the ability to adapt to routine, simple work changes in a low-demand work setting; the ability to carry out simple instructions; and the ability to maintain adequate attendance and sustain an ordinary work routine without special supervision. (Tr. 316-17). Mr. McGowan opined that such an individual could return to the past relevant work as an assembler, waitress, or mail clerk. (Tr. 317).

The VE was next asked to assume that the hypothetical individual had fair abilities to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, function independently, and maintain attention and

-3-

concentration. In addition, the individual was described as having poor abilities to deal with work stress and to remember and carry out complex instructions. (Tr. 318; 149). The elements of this hypothetical were drawn from the Medical Assessment of Ability to do Work-related Activities (Mental) completed by Donna Bond on July 28, 2006. (Tr. 148-50). The VE testified that such an individual would be able to return to her past relevant work. (Tr. 318). Plaintiff's counsel asked the VE to assume that the individual had no "useful ability" to deal with work-related stress. In response, the VE stated that "if you interpret it absolutely strictly deal with any stress at work," the individual would be unable to return to past relevant work. (Tr. 319). And, if the definition of "fair" was assumed to mean "seriously limited," the described individual would "have problems" returning to past relevant work. (Tr. 320-21).

On January 24, 2006, plaintiff completed a Function Report and a Work History Report; her husband completed a Third-Party Function report. (Tr. 51-75). In response to a question regarding her daily activities, plaintiff listed self-grooming tasks and, on "some days," putting away dishes and doing the laundry. She also listed taking a bath and a nap. (Tr. 59). She stated that she and her husband share responsibility for their daughter; she also takes care of the family's cats. (Tr. 60). She noted that she tries to clean for one to two hours each day and that she does yard work with help from her father-in-law. (Tr. 61). She goes outside every day, and is able to walk, drive a car, and ride a bicycle; she does not require assistance to engage in these activities. (Tr. 62). She goes shopping once a month for cleaning supplies; it takes about an hour. (Tr. 62). Before her illness, she wrote, she was able to work, get along with others, and control her anger. (Tr. 60). She stated that she sleeps excessively when depressed. (Tr. 60). She does not require help for self-care, but does require reminders to take her medication. She is too distracted to prepare meals

-4-

and indicated that "items on stove caused fire." (Tr. 61). She can make change and pay bills, but stated that she has never been able to manage a checkbook. (Tr. 62-63). Under "hobbies," she listed reading. She is able to spend time talking and playing games with family. Id. She becomes irritable if she misses her medications and, since her illness, is less tolerant of others. (Tr. 64). She listed the following abilities as negatively affected by her illness: hearing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others; following written instructions is more difficult than following spoken instructions. (Tr. 64). She also stated that changes in routine cause her to become "stressed out" and unable to function. (Tr. 65). Plaintiff stated that working would be very difficult for her because she alternates between phases when she has a lot of energy and phases when she cannot get out of bed. She also stated that she finds it hard to work with others when she is under stress. (Tr. 66).

Plaintiff's husband indicated that her daily activities vary with her mood and that she needs constant "help, instruction" in taking care of their daughter and the pets. (Tr. 67-68). He described her as having been a diligent worker who, although slow to understand a new task, made up for it with effort. According to Mr. Anderson, plaintiff sometimes sleeps all day. (Tr. 68). She is able to prepare sandwiches but does not use the stove because she may light a burner and then leave the house or go to sleep. She is able to do some yard work with supervision. (Tr. 70). He agreed with her assessment that she cannot use a checkbook, explaining that she will spend days trying to reconcile the ledger with the bank statement and cannot grasp that some checks are uncleared. (Tr. 70). She also has difficulty using the computer. (Tr. 71). He also agreed with her assessment that she cannot follow written instructions without help; she can follow simple spoken instructions fairly well. He described

plaintiff as irritable and easily offended or hurt.  (Tr. 71-72).  She is easily offended or hurt.  (Tr. 72).  She reacts poorly to stress, responding "with anything from tears to violence."  (Tr. 73).  He described her mood as changing rapidly, without any discernible cause.  (Tr. 73).

Plaintiff discussed her past employment: She worked as a mail clerk in 1994 and worked as a waitress from 1995 through 1998.  She indicated that she served as a Navy seaman from 1995 through 1999.  She then worked as a factory assembler from 1999 through 2005.  (Tr. 51).  In a section for remarks, plaintiff wrote,

> Was very difficult to be able to get up out of bed[,] get ready[,] eat breakfast[,] make lunch[,] get to work on time.  Then stressed out because rushing to get there on time.  My goal had been to get up at 4:00[,] get some housework done[,] then get ready for work but wasn't able to do that felt guilty at work for not being able to do it.  Dealing with other's [sic] not wanting to work[,] having to do their part[,] no support from supervisors.  Then by end of day exhausted[,] take all I had to do to do [sic] dishes take bath stay awake by end of week could sleep half the day.

(Tr. 58).

A wage report shows that plaintiff reported earnings for each year from 1994 (under $2,000) through 2005.  Her earnings increased from $13,153.23 in 1999, to $20,400.54 in 2004.  (Tr. 43).

### III.  Medical Evidence

Plaintiff received medical care at Forest City Family Practice from April 2004 through January 2008.  (Tr. 107-30).  In January 2005, it was noted that plaintiff suffered from depression (Tr. 121) and, in June 2005, both mood swings and

depression were indicated. (Tr. 117). In July, Zoloft[2] was listed among plaintiff's medications. (Tr. 115).

On July 21, 2005, plaintiff was seen for a diagnostic evaluation by Donna Bond at Pathways Community Behavioral Healthcare. (Tr. 100-05). The presenting problem as stated by plaintiff was that she got very angry "around time of month, want to hurt someone, and don't care if I do. I don't feel stable." (Tr. 100). She had been experiencing this anger for about 8 years. She had been taking Zoloft for about two years and reported that it helped "sometimes" with depression and reduced her irritability. At the time of the evaluation, plaintiff rated her depression at 5 on a 10-point scale. She described episodes during which she felt elated, slept less, and had rapid speech; these episodes typically lasted two or three days and were followed by periods of depression. (Tr. 100). In February, she took her daughter to West Virginia without informing her husband. Her husband, after filing for divorce, insisted that she get some help. Plaintiff reported that in the past she had thrown things at her husband, stabbed him in the chest with a fork, and scraped his arms with a key. Plaintiff and her husband "have had numerous times of mutual physical abuse," although neither ever required medical care. Plaintiff used a screwdriver to stab a man at work in response to inappropriate touching. (Tr. 101). Plaintiff denied any history of hallucinations, delusions, or disassociations.

---

[2]Zoloft, or Sertraline, is a member of the SSRA class and is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. It is also used to relieve the symptoms of premenstrual dysphoric disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

Plaintiff recounted that she grew up in West Virginia and had three stepsisters and ten half-brothers.[3] Her father died of myocardial infarction when she was 13 and shortly thereafter plaintiff attempted suicide by overdose. According to plaintiff's husband, other family members described plaintiff's father as "abusive and an SOB" who was rumored to have sexually abused children. A half-brother attempted to molest her when she was 11; her father called her names when she told him. Her grades were below average and she had remedial classes in speech, reading and math. (Tr. 102). During the evaluation, she made mistakes subtracting 7s from 100 and used her fingers to count. (Tr. 104). It was Ms. Bond's assessment that plaintiff presented no imminent risk of harm to self or others. Ms. Bond also noted that plaintiff had the intelligence and motivation to participate in treatment. Diagnoses included Bipolar II, rule out Post-Traumatic Stress Disorder and Attention Deficit Disorder. Plaintiff's Global Assessment of Functioning (GAF)[4] score was 39.[5] (Tr. 105).

---

[3]Elsewhere, she reported that two half-siblings were diagnosed with schizophrenia. See Tr. 236.

[4]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[5]A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

Lithium carbonate[6] and Wellbutrin[7] were prescribed, in conjunction with individual psychotherapy. (Tr. 105).

At follow-up on August 18, 2005, plaintiff reported that it was not as hard for her to get out of bed, although she had occasional crying spells. Her mood and affect were described as mildly depressed. She continued in individual therapy. A decision was made to discontinue the Wellbutrin and start a trial of Effexor.[8] The prescription for lithium was continued. (Tr. 98). Plaintiff was stable on these medications at follow-up on September 20, 2005. (Tr. 97). On November 15, 2005, she reported night sweats and her Effexor dose was reduced. (Tr. 95). It was increased again on December 20, 2005, at her request. (Tr. 156). On January 31, 2006, she reported that her mood was "kinda up and down." Her husband expressed concern that she might "run away again." (Tr. 158). Her condition was assessed as stable and her medications were continued. (Tr. 157-58).

Thomas Spencer, Psy. D., completed a consultative evaluation on February 14, 2006. (Tr. 138-41). Plaintiff described her chief complaint as "With the bipolar and the depression, doing a daily routine is sometimes very difficult." (Tr. 138). Plaintiff reported that her most recent manic episode had occurred the week before, when she was argumentative, aggravated and unable to concentrate. Id. She reported that she felt like she was "coming out of her skin." She stated that she had "unbridled energy" and little need to sleep. When she is manic, "Nothing is unachievable." (Tr. 139).

---

[6]Lithium is indicated for the treatment of manic episodes of manic-depressive illness. See Phys. Desk Ref. 1692 (61st ed. 2007).

[7]Wellbutrin, or Buproprion, is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder. See Phys. Desk Ref. 1648-49 (63rd ed. 2009).

[8]Effexor is indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 3196 (63rd ed. 2009).

When she is depressed, by contrast, she finds it hard to get up and has little energy and motivation. She described her appetite as "gluttonous." Id. According to plaintiff, her sleep cycle is variable in that there are some days when she rises at 7:00 a.m. and other days when she rises at 10:00 a.m. She spends her days cleaning or reading. Id.

Dr. Spencer reported that plaintiff made fair eye contact and her speech was within normal limits. She demonstrated no unusual mannerisms or behaviors. She was friendly and cooperative, and related well; her insight and judgment appeared fairly intact. Id. She was alert and oriented to person, place, time, and event. She appeared to be of average intelligence with intact immediate memory. She used her fingers to complete serial 3s. She named recent presidents but in the wrong order. (Tr. 140). Dr. Spencer opined that plaintiff is able to understand and follow simple to moderately complex instructions and interact appropriately in most social environments. He noted some impairment with respect to attention and concentration, but opined that she would "do better" in these domains if she remained compliant with treatment. (Tr. 141).

Plaintiff phoned Pathways to state that she was becoming manic. When reached by Ms. Bond on February 23, 2006, plaintiff reported that she had felt manic the day before but was fine at present. She endorsed irritability and distractability, but denied increased pressure to talk, impulsivity, or grandiosity. A plan was made to increase the dosage of her lithium. (Tr. 159). When seen on March 14, 2006, plaintiff reported that she might be pregnant. (Tr. 161). The decision was made to discontinue the lithium. (Tr. 160). On April 18, 2006, plaintiff reported that she was doing better,

which she attributed to her prescription for Depakote.[9]  (Tr. 163).  She spoke about conflicts with her mother-in-law, often becoming tearful.  The dosage of her prescription for Depakote was increased and she was continued on Effexor.  (Tr. 162).

Plaintiff was admitted to Phelps County Regional Medical Center on May 15, 2006.  (Tr. 143-47).  She threatened to hit her husband with an axe handle because he would not help her with housework.  Her medications were discontinued and she was started on Lamictal[10] and Prozac.[11]  She displayed "quite a bit of impulsivity and irritability initially."  She requested discharge on May 19, 2006, but agreed to remain when she was told that discharge would be against medical advice.  She renewed her request the following day and the staff agreed, even though the planning was not complete, because she had made significant progress and seemed greatly improved. Her discharge diagnoses were Bipolar Affective Disorder, depressed, and personality disorder, not otherwise specified.  (Tr. 143).  Her medications at discharge were Trazodone,[12] Prozac, and Lamictal.  (Tr. 143-44).

Plaintiff was seen by Ms. Bond for follow-up on May 23, 2006.  She was alert, pleasant, cooperative, and appropriate.  (Tr. 164-65).  On June 27, 2006, Ms. Bond noted that plaintiff believed her current medication regime was working well "for the

---

[9]Depakote, or Valproic acid, is used to treat mania in people with bipolar disorder.  www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[10]Lamictal, or Lamotrigene, is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[11]Prozac is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder.  See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

[12]Trazodone is a seratonin modulator prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia and anxiety. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

most part," although she complained of feeling "draggy." (Tr. 167). She reported that she had "trouble getting through a recipe" and cooking was difficult; similarly, she had trouble understanding "what someone says" and expressing her thoughts. She and her husband had communication issues and she wondered whether these difficulties were related to Attention Deficit Disorder. Ms. Bond wrote a letter plaintiff could take to Drury College to obtain release from classes. A trial of Strattera[13] was prescribed. (Tr. 166). On July 25, 2006, plaintiff reported that she was better able to concentrate while reading or watching television. She stated that she had improved ability to follow-through and was better organized. (Tr. 169). Her prescription for Trazodone was changed to Hydroxyzine[14] and the dosage of Strattera was increased. The Prozac and Lamictal prescriptions remained unchanged. (Tr. 168).

On July 28, 2006, Donna Bond completed a Medical Assessment of Ability to Do Work Related Activities (Mental). (Tr. 148-49). Under the category "Making Occupational Adjustments," Ms. Bond assessed plaintiff's abilities as "Fair" to "Poor or None." "Fair" was defined as "Ability to function in this area is seriously limited, but not precluded." "Poor or None" was defined as "No useful ability to function in this area." Ms. Bond made similar assessments of plaintiff's abilities in the category "Making Performance Adjustments" and "Making Personal-Social Adjustments." In narrative sections, Ms. Bond noted that plaintiff had recently been diagnosed with

---

[13]Strattera, or Atomoxetine, is a selective norepinephrine reuptake inhibitor used to increase the ability to pay attention and decrease impulsiveness and hyperactivity in children and adults with ADHD. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[14]Hydroxyzine is used to relieve the itching caused by allergies and to control the nausea and vomiting caused by various conditions, including motion sickness. It is also used for anxiety and to treat the symptoms of alcohol withdrawal. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 28, 2009).

Attention Deficit Disorder, in addition to Bipolar Disorder. She described plaintiff as having normal intelligence, "but thoughts easily become distracted. Memory and comprehension are fair at best. This might improve with treatment of ADHD with proper medication." (Tr. 148). Elsewhere, Ms. Bond described plaintiff as having "poor coping skills in interpersonal conflicts. However, she is trying to apply the new strategies she is learning." (Tr. 149). With respect to "Other Work-Related Activities," Ms. Bond stated, "Being around too many people is stressful for her, or too much environmental noise or activity." Id.

The record reflects that plaintiff received medication from Pathways on August 29, 2006 (Tr. 170), November 17, 2006 (Tr. 172-73), and December 26, 2006 (Tr. 176-77). On January 23, 2007, Ms. Bond described plaintiff's mental status as within normal limits, without evidence of hypomania or mania. (Tr. 226-27). Plaintiff reported that her husband was trying to get Social Security disability for her; he was also attempting to obtain an increase in his disability benefits from the Veterans Administration. He had been prescribed Cymbalta[15] but was refusing to take it.

Plaintiff was seen by Fauzia Iqbal, M.D., for a crisis intervention session at Pathways on February 26, 2007. (Tr. 228-29). Plaintiff reported mixed episodes of depression cycling into hypomania, with poor sleep, and increased energy and goal oriented activity. She was dysphoric and tearful during the session. Dr. Iqbal recommended that plaintiff increase the dosage of the Lamictal. Another crisis intervention session occurred on March 22, 2007. (Tr. 230-31). Dr. Iqbal noted that plaintiff recently had a manic episode and presented with "obvious" conflict with her

_____

[15]Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

husband.  Dr. Iqbal recommended a trial of Abilify[16] and family therapy.  On April 10, 2007, plaintiff reported to Dr. Iqbal that she felt "stoned" after taking Abilify and Strattera in the morning; taking the medication at night kept her from sleeping.  Dr. Iqbal suggested that plaintiff take the Abilify after lunch.  (Tr. 232).  At an office visit on April 12, 2007, plaintiff reported that the time change improved her sleep and did not cause her to feel stoned.  Her affect was described as dysphoric with constricted range.  (Tr. 233).

On April 24, 2007, Bruce Horowitz, Ph.D., completed a psychological evaluation of plaintiff at the request of her attorney.  (Tr. 235-40).  At that time, plaintiff was employed part-time in her mother-in-law's pet care business.  Plaintiff stated that she had alternating depressive and manic or hypomanic episodes.  During the manic phases, she experienced decreased sleep and appetite, increased energy, poor judgment, hypersexuality, and notable irritability and aggressiveness.  (Tr. 235).  Dr. Horowitz noted that plaintiff's Bipolar Disorder had increased in severity since her pregnancy.  (Tr. 237).  Plaintiff reported that she had "lifelong difficulties" with concentration and learning, with below-average performance in school.  In both her military and civilian jobs, she was assigned duties that accommodated her learning difficulties.  (Tr. 235).

Plaintiff's work history includes four years in the Navy where she was assigned duties in supply and security.  She was generally successful but required patient instruction and repetition to learn her duties.  She later worked on an assembly line for five years; she experienced occasional difficulties related to temper and mood.  (Tr.

---

[16]Abilify, or Aripiprazole, is used to treat the symptoms of schizophrenia.  It is also used alone or with other medications to treat episodes of mania or mixed episodes in persons with bipolar disorder.  www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

236).  Dr. Horowitz described plaintiff's performance in work settings as "marginal and enabled by support, tolerance and accommodation."  (Tr. 237).  As an example, Dr. Horowitz noted that when plaintiff "lost it" on the assembly line, her supervisor  would move her to another part of the operation.  Id.

Plaintiff's affect was generally appropriate but mildly blunted; the flow and content of her thought during the interview were normal and she displayed no difficulties in attending throughout the ninety-minute interview.  She was fully oriented and exhibited intact short-term memory.  Dr. Horowitz described plaintiff  as cooperative, appropriate and relevant when answering questions.  Dr. Horowitz proffered tentative diagnoses of Bipolar Disorder II, Post-Traumatic Stress Disorder, Attention Deficit Disorder, and possible features of Borderline Personality Disorder.

In completing the Medical Assessment of Ability to Do Work-Related Activities (Mental), Dr. Horowitz assessed plaintiff's abilities as "fair," with the exception of the following areas, which were assessed as "good": ability to follow work rules; ability to understand, remember and carry out simple job instructions, and maintain personal appearance, and demonstrate reliability.  (Tr. 239-40).  Her ability to deal with work stress was assessed as "poor."   (Tr. 240).  Dr. Horowitz wrote that plaintiff was "particularly likely" to behave in an emotional and aggressive manner during manic or hypomanic episodes.  Id.  Despite the poor rating, Dr. Horowitz opined that medication and psychosocial interventions had been effective "in attenuating [plaintiff's] symptoms sufficiently to stabilize her family situation and allow her to manage moderate levels of stress."  She was functioning adequately in her part-time job, where her limitations are accommodated and tolerated.  Dr. Horowitz concluded that plaintiff had "at least limited capacity for work in a supportive and low stress environment."  (Tr. 238).

In May 2007, plaintiff began treatment at the Veterans Administration Medical Center. (Tr. 241-305). She explained that she no longer had Medicaid coverage for her mental health treatment at Pathways and wanted to obtain her psychiatric care through the VA. (Tr. 300, 303). Plaintiff reported that her current medication regime was the most effective and that she was presently "doing fairly well." (Tr. 298).

At her initial counseling appointment, plaintiff reported that she had a manic episode in May, during which she cleaned the house, called people at midnight, and talked excessively. (Tr. 285-86). She reported that she was presently getting along with her husband "for the most part." (Tr. 286). She reported some tension with her in-laws, and described mother-in-law as intrusive. Id. On June 21, 2007, her medications included Aripiprazole, Lamotrigine, and Trazodone. (Tr. 293). Her diagnoses throughout her treatment at the VA Medical Center included Bipolar Disorder and ADHD; her GAF ranged between 55[17] and 65.[18]

On August 27, 2007, plaintiff reported that she intended to stop working for her mother-in-law and hoped to get approved for the local sheltered workshop. Although the pay would be lower, she believed that this plan would be better for her socially and emotionally. (Tr. 279-80; 277). In September 2007, she reported that she enjoyed the sheltered workshop. (Tr. 276). In October 2007, plaintiff reported that she was pregnant and had stopped taking her psychotropic medications. (Tr. 273). She

---

[17]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[18]A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

continued to report contentment with work and was generally stable throughout the pregnancy. Plaintiff gave birth to a healthy boy on May 4, 2008. (Tr. 242). She resumed her prescriptions for Abilify and Lamatrogine in accordance with the plan she developed with treatment providers. Id.

Glen D. Frisch, M.D., a psychiatrist, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment on March 1, 2006. (Tr. 76-92). Dr. Frisch indicated that plaintiff has Bipolar syndrome, an affective disorder; he did not endorse an anxiety disorder or personality disorder. In determining plaintiff's functional limitations, Dr. Frisch assessed plaintiff as having moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 86, 90). In a narrative section, he noted that plaintiff's allegation of Bipolar Disorder was consistent with the medical evidence and was credible. (Tr. 88).

The record includes the transcript of the deposition of Gary Weimholt, taken on April 5, 2007. (Tr. 210-25). Mr. Weimholt is qualified as a Vocational Expert by the Social Security Administration. He testified that he reviewed the assessment of ability to work completed by Donna Bond. He noted that plaintiff had been rated as having poor to no ability to deal with work stress and opined that her past relevant work as assembler, waitress, and mail clerk would all expose her to some work stress. Taking all of plaintiff's ratings in the aggregate, Mr. Weimholt opined that plaintiff would be unable to meet the usual essential demands of jobs, which he identified as functioning independently, following the rules, maintaining attention and concentration, and demonstrating reliability. (Tr. 217-19).

## IV. The ALJ's Decision

In the decision issued on January 25, 2007, the ALJ made the following findings:

1. Plaintiff met the disability insured status requirements on February 18, 2005.

2. Plaintiff had not engaged in substantial gainful activity since at least February 18, 2005.

3. The medical evidence established that plaintiff has bipolar disorder, depression and anxiety, and does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. Plaintiff's allegations of symptoms or combination of symptoms of such severity as to preclude all substantial gainful activity were not consistent with the evidence as a whole and were not credible.

5. Plaintiff's impairments allow her to understand and remember simple and detailed instructions; respond appropriately to supervisors and coworkers; adapt to routine/simple changes in a low demand work setting; carry out simple instructions; maintain adequate attendance; and maintain an ordinary work routine without special supervision.

6. Plaintiff can perform her past relevant work as an assembly worker, waitress and mail clerk.

7. Plaintiff is twenty-nine years old and has fourteen years of education.

8. In view of her age and residual functional capacity, the issue of transferability of work skills is not material.

9. Plaintiff has been able to perform past relevant work since February 18, 2005.

10 Plaintiff has been able to perform substantial gainful activity since February 18, 2005, and was not under a disability, as defined in the Social Security Act, at any time through the date of the decision.

(Tr. 17-18).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which

can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." <u>Nimick v. Secretary of Health and Human Serv.</u> 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (2002); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).

A.    <u>Standard of Review</u>

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.     The ALJ's credibility findings;

2.     the plaintiff's vocational factors;

3.     the medical evidence;

4.     the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.     third-party corroboration of the plaintiff's impairments; and

6.     when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217, (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.**    **Analysis**

Plaintiff contends that the ALJ committed error in determining that she retained the Residual Functional Capacity (RFC) to return to her past relevant work as an assembly worker, waitress and mail clerk. This determination was based on the ALJ's finding that plaintiff has the ability to understand and remember both simple and detailed instructions, respond appropriately to supervisors and coworkers, carry out simple instructions, maintain adequate attendance, and maintain an ordinary work routine without special supervision.

1.    Credibility determination:    The ALJ determined that plaintiff's allegations of disabling impairments were not credible. To the extent that plaintiff challenges this determination, the Court finds that there was no error. In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions." The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, the ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. Where an ALJ explicitly considers the Polaski factors and discredits the plaintiff's complaints for good reason, the courts will normally defer to that decision. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001), quoting Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).

In this case, the ALJ noted the inconsistencies between plaintiff's alleged limitations and the medical record. For example, there is no evidence in the record that any treating physician ever imposed significant mental or physical limitations on plaintiff's functional capacity or recommended that she cease working. Similarly, there is no evidence that her alleged impairments caused an employer dissatisfaction or that she stopped working because of her alleged impairments. Plaintiff required only one brief hospitalization since her alleged onset date, and her condition was quickly stabilized. Medication routinely improved her functioning. There is no indication that plaintiff was noncompliant with treatment. Most significantly, evidence submitted to the Appeals Council indicates that plaintiff functioned well while working at a sheltered workshop and in her mother-in-law's business. The Court finds that there was no error in the ALJ's credibility determination.

2.   <u>RFC determination</u>:   Plaintiff challenges the ALJ's RFC determination. The RFC is the most that a claimant can do despite physical or mental limitations. <u>Masterson v. Barnhart</u>, 363 F.3d 731, 737 (8th Cir. 2004); § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. <u>Id.</u> Ultimately, however, the determination of RFC is a medical issue, <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000), which requires the consideration of supporting evidence from a medical professional, <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).

The record before the ALJ included the "Medical Assessment of Ability to Do Work-Related Activities (Mental)" completed by Donna Bond in 2006. (Tr. 148-49).

As noted above, Ms. Bond assessed plaintiff as having "fair" ability to relate to coworkers, deal with the public, use judgment, interact with supervisors, function independently, and maintain concentration and attention, and "poor" ability to understand and carry out complex job instructions. Ms. Bond believed that plaintiff's ability to follow simple job instructions might rise to "good" in a low-stress environment.

The ALJ discounted Ms. Bond's assessment, first finding that she was not an "acceptable medical source." (Tr. 15). Social Security separates information sources into two main groups: *acceptable medical sources* and *other sources*. It then divides *other sources* into two groups: *medical sources* and *non-medical sources*. 20 C.F.R. §§ 404.1502, 416.902 (2007). As a nurse practitioner, Ms. Bond qualifies as an "other" medical source. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). "Other sources" cannot be relied upon to establish the existence of a medically determinable impairment, but may provide evidence to show the severity of impairments and how they affect the claimant's ability to work. 20 C.F.R. § 404.1513(d)(1); Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). Thus, it was error to discount Ms. Bond's assessment on the basis of her professional qualifications.

Defendant concedes that Ms. Bond's opinion is entitled to consideration but argues that her assessment of plaintiff's abilities is unsupported both by the medical record as a whole and her own observations. The Court agrees. Although plaintiff described crying spells, racing thoughts, and distractability, Ms. Bond routinely noted that plaintiff's mental status was within normal limits. She described plaintiff as pleasant and cooperative, with intact memory, and displaying normal speech, thoughts, insight and judgment. As the ALJ noted, there are no medical records indicating that plaintiff suffered from symptoms that could not be controlled by

-23-

medication. (Tr. 16). Plaintiff experienced one brief inpatient admission during which she stabilized rapidly once her medications were adjusted. Upon discharge, she was described as "greatly improved," with a "good" mood and "bright" affect. Her judgment and insight had "markedly improved." (Tr. 143).

Plaintiff cites Dr. Horowitz's assessment in 2007 to support her claim.[19] Dr. Horowitz is a licensed psychologist and thus an acceptable medical source under the regulations. Despite giving plaintiff low ratings on individual work abilities, (Tr. 239-40), in the narrative portions of the report, Dr. Horowitz noted that plaintiff had a normal mental status and exhibited no difficulty in attending throughout the course of a 90-minute interview. (Tr. 237). He concluded that she had "at least limited capacity for work in a supportive and low stress environment." (Tr. 238). Finally, at the time of her interview with Dr. Horowitz, plaintiff was functioning adequately in her part-time job at her mother-in-law's pet grooming business. "Working generally demonstrates an ability to perform a substantial gainful activity." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005). The Appeals Council concluded that Dr. Horowitz's assessment supported a determination that plaintiff is able to work. (Tr. 4). This conclusion is supported by substantial evidence in the record as a whole.

Consultative examiner Thomas Spencer gave somewhat higher ratings of plaintiff's abilities did Ms. Bond and Dr. Horowitz, concluding that despite some impairment with regard to attention and concentration, she could understand and follow simple to moderately complex instructions. He also opined that she had the capacity to interact in an appropriate manner in most social environments. He noted that plaintiff's prognosis is dependent on her compliance with treatment. (Tr. 141).

---

[19]This assessment was obtained after the ALJ issued his decision and was submitted to the Appeals Council.

In summary, the Court concludes that the ALJ properly discounted Ms. Bond's assessment as inconsistent with the medical record; the Appeals Council properly determined that Dr. Horowitz's assessment supported a finding that plaintiff can work; and the ALJ's RFC determination is supported by substantial evidence in the record.

3.    Past Relevant Work determination: The ALJ determined that plaintiff could perform her past relevant work.  Plaintiff argues that this finding is based upon an erroneous understanding of the VE's testimony.

In response to the hypotheticals posed by the ALJ, the VE stated that plaintiff could return to work.  One hypothetical scenario was based on Ms. Bond's assessment that plaintiff had only "fair" abilities, at best.  Plaintiff's counsel then asked the VE to assume that "fair" was defined as "seriously limited."  (Tr. 320).  The VE demurred, noting the official definition of "fair" is "seriously limited but not precluded."  The VE then stated an individual with "serious" limitations would have "serious problems" but refused to state that the individual could not return to past relevant work.  (Tr. 321).  Plaintiff's counsel also asked the VE whether a person with no useful ability to cope with work stress could perform the past relevant work.  (Tr. 319).  The VE answered that the person could not.  (Tr. 320).

The ALJ did not credit Ms. Bond's determination that plaintiff had no useful ability to cope with work stress and, thus, the VE's opinion with respect to such a hypothetical claimant is irrelevant.  A hypothetical question to the VE need only include impairments that are supported by the record and which the ALJ accepts as valid. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000).  A VE's testimony based on a properly phrased hypothetical constitutes substantial evidence.  Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999).  This case is distinguishable from McCadney v. Astrue, 519 F.3d 764 (8th Cir. 2008), upon which plaintiff relies, where the ALJ did not include

all the limitations found by the consultative examiner but did not state what weight was afforded to the examiner's opinion.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #22] is **denied**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of February, 2010.